# United States Court of Appeals
# for the Federal Circuit

---

**WMI HOLDINGS CORP., FKA WASHINGTON MUTUAL INC., AS SUCCESSOR IN INTEREST TO H.F. AHMANSON & CO. AND SUBSIDIARIES, FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION, AS SUCCESSOR IN INTEREST TO HOME SAVINGS OF AMERICA, SAVINGS OF AMERICA, INC., AS SUBSTITUTE AGENT FOR H.F. AHMANSON & CO. AND SUBSIDIARIES,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-1944

---

Appeal from the United States Court of Federal Claims in Nos. 1:08-cv-00211-LKG, 1:08-cv-00321-LKG, Judge Lydia Kay Griggsby.

---

Decided: June 4, 2018

---

ALAN I. HOROWITZ, Miller & Chevalier Chartered, Washington, DC, argued all for plaintiffs-appellants.

Plaintiff-appellant WMI Holdings Corp. also represented by MARIA O'TOOLE JONES, STEVEN R. DIXON.

TAMARA L. SHEPARD, DLA Piper US LLP, Boston, MA, for plaintiff-appellant Federal Deposit Insurance Corporation.

THOMAS D. JOHNSTON, Shearman & Sterling LLP, Washington, DC, for plaintiff-appellant Savings of America, Inc. Also represented by RICHARD JOHN GAGNON, JR.

ANDREW M. WEINER, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by DAVID A. HUBBERT, BRUCE R. ELLISEN.

---

Before PROST, *Chief Judge*, DYK and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This appeal involves Appellant WMI Holdings Corp.'s ("WMI's") claim for a refund of federal taxes paid by its predecessor.[1] WMI contends it is entitled to more than $250 million in refunds attributable to losses and deductions that its predecessor should have received for certain intangible assets acquired from the federal government in the 1980s.

---

[1] WMI, as successor to H.F. Ahmanson & Co. ("Ahmanson") and its subsidiary, Home Savings of America ("Home"), is one of three appellants. The others are the Federal Deposit Insurance Corporation, as receiver for Home's successor; and Savings of America, Inc., as substitute agent for Ahmanson. For simplicity, we refer only to WMI unless otherwise specified.

The United States Court of Federal Claims ("Claims Court") dismissed WMI's refund action, finding that WMI failed to establish, to a reasonable degree of certainty, a cost basis in each of the assets at issue. *See Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653 (2017) ("*Claims Court Decision*"). The court's finding is not clearly erroneous, and, accordingly, we affirm.

## BACKGROUND

The parties' dispute evolved out of transactions originating during the savings-and-loan crisis in the late 1970s and early 1980s. We begin with a description of that crisis and the facts leading up to the disputed transactions.

## I. Savings-and-Loan Crisis

As their names suggest, savings-and-loan institutions, also called "thrifts," provide two main services. They collect customer deposits, which are maintained in interest-bearing savings accounts, and they originate and service mortgage loans funded by those deposits. Historically, thrifts were profitable because the interest they collected on outstanding loans exceeded the interest they paid out to customers.

That changed, however, in the late 1970s. First, interest rates rose to unprecedented levels, and thrifts, which were locked into long-term, fixed-rate mortgages, were unable to compensate for this increase by raising the interest rate on their mortgage loans. *See United States v. Winstar Corp.*, 518 U.S. 839, 845 (1996) (describing events precipitating the savings-and-loan crisis). To maintain their customers, moreover, thrifts were forced to raise the interest rates they paid on deposit accounts, causing the thrifts to operate at a loss. *Id.* Second, the industry suffered from "disintermediation," whereby customers withdrew their deposits in favor of alternative investments paying higher interest rates. This one-two

punch had a devastating effect on the industry, causing many thrifts to become insolvent. Between 1981 and 1983 alone, some 435 thrifts failed. *Id.*

Lacking the funds to liquidate the failing thrifts, the Federal Savings and Loan Insurance Corporation ("FSLIC"), as thrift regulator and insurer of deposits, responded to the crisis by encouraging healthy thrifts to take over failing ones in what were called "supervisory mergers." *Id.* at 847. These transactions relieved the FSLIC of its deposit insurance liability for the insolvent thrifts, and, in exchange, provided a package of non-cash incentives to acquiring thrifts. Two of those incentives are at issue here: "branching" rights and "RAP"—or "regulatory accounting purposes"—rights.

Branching rights permitted acquiring thrifts to open and operate branches in states other than their home states, which, prior to 1981, was generally prohibited. *See* 12 C.F.R. § 556.5(a)(3) (1981). This prohibition was eliminated for thrifts entering into supervisory mergers across state lines. *See id.* § 556.5(a)(3)(ii)(A) (1982). RAP rights, by contrast, affected regulatory accounting treatment for business combinations. At the time, regulations mandated, in relevant part, that each thrift maintain a minimum capital of at least 3% of its liabilities. *See id.* § 563.13(a)(2), (b)(2) (1983); *Winstar*, 518 U.S. at 845–46. This requirement presented an obstacle for healthy thrifts seeking to acquire failing ones because, by definition, failing thrifts' liabilities exceeded their assets. Regulators eliminated this obstacle by permitting acquiring thrifts to use Generally Accepted Accounting Principles ("GAAP"). In essence, GAAP allowed acquiring thrifts to treat failing thrifts' excess liabilities as an asset called "supervisory goodwill," which, in turn, could be counted toward the acquiring thrifts' minimum regulatory capital requirement and amortized over a forty-year period (later re-

duced to twenty-five years).[2] *Winstar*, 518 U.S. at 850–51. The RAP rights provided by FSLIC guaranteed such treatment, regardless of future regulatory changes.

The combination of branching and RAP rights induced healthy thrifts to enter into supervisory mergers throughout the 1980s.

## II. The Transactions at Issue

One such thrift was Home Savings of America ("Home"), a subsidiary of WMI's predecessor. Originally based in Los Angeles, Home grew to become one of the largest thrifts in the United States. Home took part in two categories of transactions in the 1980s that are relevant here.

First, between 1981 and 1985, Home entered into four supervisory mergers in six states—Missouri, Florida, Texas, Illinois, New York, and Ohio—thereby assuming the acquired thrifts' liabilities in exchange for branching and RAP rights. Home would later sell off those branches in the 1990s in an effort to focus on its California presence.

Second, in 1988, Home acquired Bowery Savings Bank ("Bowery"), a federally chartered mutual savings bank headquartered in New York. Prior to the acquisition, the Federal Deposit Insurance Corporation ("FDIC") had been providing Bowery with assistance, including a RAP right, pursuant to a 1985 government-assisted merger. In connection with Home's 1988 acquisition, however, Bowery negotiated a new assistance package, which, among other things, replaced the 1985 RAP right

---

[2] Amortization reflects an intangible asset's depreciation over time, and, accordingly, requires a business to "'write down' the value of the asset each year to reflect its waning worth." *Winstar*, 518 U.S. at 851 & n.7.

with a new one. Like the supervisory RAP right, the 1988 Bowery RAP right allowed Bowery to count the goodwill arising out of the acquisition toward regulatory capital. Unlike the supervisory RAP right, however, the 1988 Bowery RAP right established an amortization period of twenty years as opposed to forty years. This represented an increase from the fourteen-year period established by the 1985 Bowery RAP right.

Home's branching and RAP rights are considered intangible assets for tax purposes, and, as such, are generally subject to abandonment loss deductions under I.R.C. § 165, and amortization deductions under I.R.C. § 167(a), respectively.

### III. Procedural History

Home's consolidated parent, H.F. Ahmanson & Co. ("Ahmanson"), filed income tax returns on behalf of Home, claiming deductions based on the transactions described above. Those claims spawned the litigation at issue here, as well as a related proceeding in the Ninth Circuit.

### A. The Ninth Circuit's Ruling

In 2008, WMI—then known as Washington Mutual, Inc.—brought suit against the United States in the U.S. District Court for the Western District of Washington, seeking a refund for tax years 1990, 1992, and 1993 based on the amortization of the RAP rights obtained in one of the supervisory mergers, as well as the abandonment of Home's Missouri branching rights. To support its claims, WMI proffered a valuation report and testimony from its expert, Roger Grabowski, who used an income-based approach to determine the fair market value of the rights at issue. The district court granted judgment in favor of the government, rejecting WMI's refund claims because WMI did "not prove[], to a reasonable degree of certainty,

Home's cost basis in the Branching and RAP rights."[3] *Wash. Mut., Inc. v. United States*, 996 F. Supp. 2d 1095, 1097 (W.D. Wash. 2014) ("*WaMu I*").

In an opinion issued several months after the Claims Court issued its opinion in this case, the Ninth Circuit affirmed. *See Wash. Mut., Inc. v. United States*, 856 F.3d 711, 714 (9th Cir. 2017) ("*WaMu II*"). The court rejected WMI's argument that the district court required an unprecedented level of precision and held that the district court did not err in determining that the "cumulative flaws underlying the Grabowski Model rendered it incapable of producing a reliable value for the Branching Right." *Id.* at 722–25.

## B. The Claims Court's Decision

Meanwhile, WMI also filed suit in the Claims Court against the United States, seeking a refund of more than $250 million for tax years 1991, 1994, 1995, and 1998. WMI claimed it was entitled to a refund based on the amortization of the RAP rights obtained in the supervisory mergers and the Bowery acquisition, as well as the abandonment of Home's Florida, Illinois, New York, and Ohio branching rights.

WMI offered a valuation report from Grabowski that was nearly identical to the report he presented in the Washington case.[4] And, like the Washington district

---

[3] "[T]he term 'basis' refers to a taxpayer's capital stake in property and is used to determine the gain or loss on the sale or exchange of property and the amount of depreciation allowances." *In re Lilly,* 76 F.3d 568, 572 (4th Cir. 1996) (internal quotation marks omitted). The basis of an asset is typically its cost, also known as its "cost basis." I.R.C. § 1012(a).

[4] WMI asserts that Grabowski's analysis in this case differs from that presented in the Washington case.

court, the Claims Court rejected Home's tax refund claims, finding that WMI had failed to prove Home's cost basis in each of the branching rights, RAP rights, and Bowery government assistance rights. *Claims Court Decision*, 130 Fed. Cl. at 688–704.

WMI timely appealed the Claims Court's ruling to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

There is no dispute that Home has *some* cost basis in its RAP and branching rights collectively, and that WMI is entitled to a tax refund *if* it can allocate the cost basis to each of those rights individually. There is also no dispute that WMI bears the burden of proving it is entitled to a refund. Before addressing whether WMI satisfied that burden, we first address WMI's contention that the Claims Court applied an incorrect legal framework. That issue is a legal one that we review de novo. *See Kan. Gas & Elec. Co. v. United States*, 685 F.3d 1361, 1366 (Fed. Cir. 2012); *Okerlund v. United States*, 365 F.3d 1044, 1049 (Fed. Cir. 2004).

## I.  Legal Framework

It is well established that, "[i]n a tax refund case, the ruling of the Commissioner of Internal Revenue is presumed correct." *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998). To rebut that presumption

---

*See* Reply 11. When pressed at oral argument before this court, however, WMI was unable to identify any differences, and conceded that "the general approach was similar." *See* Oral Arg. at 14:47–15:10, *WMI Holdings Corp. v. United States* (No. 2017-1944), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2017-1944.mp3.

of correctness, "[i]t is not enough" for a taxpayer "to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects." *United States v. Janis*, 428 U.S. 433, 440 (1976). Instead, the taxpayer must also prove the *amount* of the refund due. *Id.*; *Bubble Room*, 159 F.3d at 561 ("To rebut this presumption of correctness, the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination. In addition, the taxpayer has the burden of establishing entitlement to the specific refund amount claimed." (citation omitted)).

Thus, "if insufficient evidence is adduced upon which to determine the amount of the refund due, the Commissioner's determination of the amount of tax liability is regarded as correct." *WaMu II*, 856 F.3d at 721 (internal quotation marks omitted); *see Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999) (affirming the trial court's finding that the taxpayers had not substantiated their claims regarding the amount of income excluded from their taxable income); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7–8 (Fed. Cir. 1990) (stating that the taxpayer "must come forward with enough evidence to support a finding contrary to the Commissioner's determination," and must thereafter "carry the ultimate burden of proof"); *Better Beverages, Inc. v. United States*, 619 F.2d 424, 428 n.4 (5th Cir. 1980) ("Where the taxpayer fails to carry this burden to prove a cost basis in the item in question, the basis utilized by IRS, which enjoys a presumption of correctness, must be accepted even where, as here, the IRS has accorded the item a zero basis.").

The Claims Court here recognized that Home had *some* cost basis in the branching and RAP rights acquired in each of the supervisory mergers. The "central issue" was whether WMI could establish the portion of each merger's purchase price that should be allocated to each constituent right so as to enable the court to determine Home's cost basis therein. *See Claims Court Decision*, 130

Fed. Cl. at 690. In particular, because WMI paid a lump-sum purchase price for the rights in each transaction, it was required to allocate "the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition." *WaMu II*, 996 F. Supp. 2d at 1104; *see Bixby v. Comm'r*, 58 T.C. 757, 785 (1972) ("[W]hen a taxpayer buys a mixed group of assets for a lump sum, the purchase price will be allocated among the assets in accordance with the relative value that each item bears to the total value of the group of assets purchased.").

To meet this burden, WMI was *not*, of course, required to allocate the purchase prices with absolute precision. *See Miami Valley Broad. Corp. v. United States*, 204 Ct. Cl. 582, 601 (1974) ("Mathematical precision is impossible, and the broadest kind of estimates must be made."). But, as the Claims Court noted, WMI *was* required to establish the values of the rights to a "reasonable degree of certainty." *Claims Court Decision*, 130 Fed. Cl. at 687 (quoting *WaMu I*, 996 F. Supp. 2d at 1102). Ultimately, the court determined that WMI failed to meet that burden, finding that it did not put forward "sufficient evidence for the Court to make a 'reasonable and rational approximation' of the value of those assets." *Id.* at 690. The court's statements are consistent with the legal principles articulated above and demonstrate that the court applied the correct legal framework.

WMI argues that, if the court disagreed with WMI's valuation, it should have made its best guess as to what the correct cost basis should be. We disagree. While we recognize the difficulty a taxpayer faces when trying to allocate cost basis in connection with these types of decades-old transactions, a trial court is not required to undertake an independent analysis when, as here, the taxpayer's own evidence is insufficient to allow the court to do so. *See Trigon Ins. Co. v. United States*, 234 F. Supp. 2d 581, 591 (E.D. Va. 2002) ("The sophisticated

valuation techniques here can only be employed reliably by an expert in the field. That exercise is beyond the reach, and outside the province, of a district judge."). A contrary rule effectively would shift the burden of proof from the taxpayer to the court. While it is true that a court "has discretion in choosing a method of evaluation and some leeway in determining the amount of fair market value," it "has no discretion to make a finding of the value of an asset where there is *no* evidence to support it." *Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992); *see Trigon*, 234 F. Supp. 2d at 587 (rejecting the argument that "the taxpayer need not prove that its proffered valuation is correct, but only that the correct refund amount is something higher than that advocated by the United States"). Thus, "[i]f the court is not satisfied that [a] taxpayer has properly allocated a value to an identified severable intangible asset, it is not *a fortiori* the duty of the court to determine that value[.]" *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 765 (1994).[5]

Relying on *Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005), WMI nevertheless contends that, notwithstanding minor flaws in the taxpayer's proffered valuation, the court "must do its best to calculate a reasonable and correct basis." Appellants Br. 25 (quoting *Capital Blue*, 431 F.3d at 120). In that case, the Third Circuit reversed the Tax Court's zero cost basis determination in hundreds of insurance contracts, despite "several flaws" in the taxpayer's valuation of those contracts. *Capital Blue*, 431 F.3d at 119–20. But *Capital Blue* does not stand for the broad proposition that a court *must* undertake its own analysis or that a zero cost basis determination can *never* be appropriate. In fact, the Third

---

[5] The court *may* make such a determination, but only "if the value can be determined from a review of the record in its entirety." *Kraft*, 30 Fed. Cl. at 765.

Circuit remanded for the Tax Court to determine "whether the Commissioner is correct about [certain additional] flaws in Capital's data and methodology" that the Commissioner identified on appeal, and "the extent to which those flaws invalidate [the expert's] ultimate valuation." *Id.* at 140.

Instead, *Capital Blue* stands for the more limited proposition that it is unreasonable to reject a taxpayer's valuation simply because the government identified "minor flaws" in the valuation. *Id.* at 130 ("[I]t will not, in our view, be reasonable for a court to reject the taxpayer's valuation out of hand simply because the Commissioner has identified minor flaws in the valuation."). As described below, the flaws that the Claims Court identified here are major and systemic, which distinguishes this case from *Capital Blue*. Finally, the Third Circuit noted in *Capital Blue* that the taxpayer bears a "heavy burden" to prove that its intangible assets may be valued separately and with "reasonable precision," and this burden "will often prove too great to bear." *Id.* at 129–30 (internal quotation marks omitted). Thus, notwithstanding its holding, the *Capital Blue* court applied a standard similar to the standard that WMI argues the Claims Court incorrectly applied here.

WMI also relies on *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), for the proposition that a court should "make as close an approximation as it can." Appellants Br. 47 (citing *Cohan*, 39 F.2d at 543–44). In that case, the Second Circuit reversed the Tax Court's predecessor's disallowance of deductions for business entertainment expenses on the basis that the taxpayer failed to keep adequate business records. *Cohan*, 39 F.2d at 543–44. We have noted, however, that the *Cohan* rule does not apply where a taxpayer fails to provide evidence that would permit an informed estimate of the amount of deduction in the first place. *See, e.g., Charron*, 200 F.3d at 794 (stating that *Cohan* "does not require the conclu-

sion" that "vague and unpersuasive" testimony is "sufficient to establish . . . entitlement to . . . claimed deductions").

The Ninth Circuit has cautioned, moreover, that liberal application of the *Cohan* rule "would be in essence to condone the use of that doctrine as a substitute for burden of proof." *Coloman v. Comm'r*, 540 F.2d 427, 431–32 (9th Cir. 1976); *see Trigon*, 234 F. Supp. 2d at 591 (refusing to apply *Cohan* to complex valuation cases where "the basic evidentiary predicate for valuation has been found wanting in so many ways" because, "to do so would offend fundamental precepts respecting the nature and importance of the burden of proof"). We agree with the Ninth Circuit that, on these facts, "such a proposition would essentially do away with the taxpayer's burden" altogether. *WaMu II*, 856 F.3d at 727.

Finally, WMI's reliance on *Meredith Broadcasting Co. v. United States*, 186 Ct. Cl. 1 (1968), is similarly misplaced. There, the Court of Claims found that the value of various television network affiliation contracts "was created largely by plaintiff's vendor having combined them in one ownership, and would all alike have been destroyed by being severed." *Id.* at 24. Because of the unique nature of the contracts, the court determined that "an accurate allocation of value among the several classes of intangibles is impossible," and that the court must therefore "make the broadest kind of estimate." *Id.* Here, however, there is no allegation that the rights at issue cannot be severed and valued independently. Indeed, while the Claims Court did not reach the issue, the parties agree that a tax deduction for the branching rights required, as a prerequisite, that those rights had been abandoned. The RAP rights have no such prerequisite. Thus, unlike the rights in *Meredith Broadcasting*, the rights here are clearly severable, even if calculating the impact of that severance is difficult.

We therefore conclude that the Claims Court did not apply an incorrect legal framework. Notably, our conclusion is consistent with that reached by the Ninth Circuit on virtually identical facts. *See WaMu II*, 856 F.3d at 725–27.

We next address whether the flaws in Grabowski's valuation were so deficient as to justify a zero cost basis determination for the supervisory mergers and Bowery acquisition.

## II. Supervisory Mergers

As described above, the Claims Court found that WMI failed to meet its burden of establishing a cost basis in each of the RAP and branching rights that Home acquired in the supervisory mergers. We review the trial court's factual findings, including its determination of the assets' fair market values, for clear error. *See Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1379–80 (Fed. Cir. 2013); *Kan. Gas & Elec.*, 685 F.3d at 1366; *Okerlund*, 365 F.3d at 1049.

## A. RAP Rights

The Claims Court found that it could not assess the value of Home's RAP rights because WMI had mischaracterized the nature of those rights. *Claims Court Decision*, 130 Fed. Cl. at 691–95. As explained below, the court's findings are not clearly erroneous.

Grabowski valued each RAP right as "a contract[ual] right conveyed to Home by FSLIC" that "allowed Home to treat the goodwill recorded in the transaction as an asset (on a diminishing basis over 40 years) for purposes of meeting regulatory capital requirements." J.A. 7148. Specifically, he estimated the cost associated with raising and maintaining replacement capital to maintain the hypothetical willing buyer's pre-merger capital level. In other words, Grabowski assumed that Home needed the approval of government regulators to treat the goodwill

created by these transactions as an asset subject to amortization over a period of up to forty years. This assumption, however, is flawed.

The Claims Court noted that it "is without dispute that the accounting regulations in place at the time of the" supervisory mergers "required that Home use the purchase method of accounting," which provided for the treatment of goodwill as an asset. *Claims Court Decision*, 130 Fed. Cl. at 692. The court pointed out, for example, that the Federal Home Loan Bank Board's September 1981 Memorandum R-31b mandated that acquiring thrifts account for the goodwill created by the merger in accordance with GAAP, which, in turn, required thrifts to use the purchase method of accounting to account for supervisory mergers. *Id.* That method allowed companies to treat goodwill as an asset, and to amortize that goodwill over a period of up to forty years.

Thus, as the Claims Court properly found, the RAP rights Home acquired as part of the supervisory mergers were in the nature of "a guarantee"—i.e., "the right to *continue* to amortize the goodwill created by these mergers over a period of forty years if the regulations governing the amortization period for goodwill changed in the future." *Id.* at 692–93. Grabowski's valuation of the rights as *creating* a contractual approval to treat goodwill as an asset was therefore predicated on an incorrect interpretation of the nature of those rights, and caused Grabowski to overvalue them.

WMI objects to the Claims Court's interpretation of Memorandum R-31b as having given Home the right to use the purchase method of accounting and to amortize supervisory goodwill. WMI argues that the memorandum simply authorized regulators to approve such amortization upon application by an acquiring thrift. To support that argument, WMI points to the memorandum's reference to an "application from an association requesting

approval for a business combination to be accounted for by the purchase method of accounting." Appellants Br. 42 (quoting J.A. 4361). We disagree. The memorandum provides that accounting for goodwill in accordance with GAAP is acceptable for regulatory purposes. *See* J.A. 4359 ("Accounting for business combinations involving insured institutions should be in accordance with generally accepted accounting principles (GAAP)."); *see also Am. Fed. Bank, FSB v. United States*, 62 Fed. Cl. 185, 187 (2004) (noting that Memorandum R-31b "allowed acquiring thrifts to apply the purchase method to account for mergers, such that any excess amount paid by the acquiror over the net fair market value of the assets acquired and liabilities assumed was assigned to 'goodwill' considered as an intangible asset for purposes of regulatory capital"). The "application" referenced in Memorandum R-31b, therefore, reflects the fact that all business combinations were required to obtain regulatory approval, regardless of whether they intended to use the purchase method of accounting or a different method. *Claims Court Decision*, 130 Fed. Cl. at 693 n.33. "Application" does not refer, as WMI contends, to regulatory approval to use the purchase method of accounting.

In sum, the Claims Court found that Grabowski's misplaced assumptions about the nature of the RAP rights undermined WMI's fair market value determinations for those rights. Because the court's findings are not clearly erroneous, we affirm the court's ruling.

## B. Branching Rights

The Claims Court also found that it could not assess the value of Home's branching rights because Grabowski's valuation was "unreasonable," "unsupported," and "unreliable." *Id.* at 695–96. While perhaps phrased more harshly than necessary, the court's findings are not clearly erroneous.

To value the branching rights, Grabowski used an income-based approach in which he forecast the cash flow that a hypothetical willing buyer would have expected to generate as a result of having a right to operate in a state other than the thrift's home state. The "main assumptions" he made in his analysis "were the number of new branches, the growth of deposits in new and acquired branches, and the income the willing buyer would earn on new mortgage loans made with those deposits." J.A. 7140.

With respect to the number of new branches, Grabowski based his projection in part on Home's own expansion into Northern California. In 1970, Home entered Northern California by acquiring four branches in the San Francisco area with $36.4 million in deposits, or $9.1 million per branch, representing 0.6% of the market. Over the next ten years, Home expanded to forty Northern California branches and increased its total inflation-adjusted deposits to $760.1 million, or $19 million per branch, representing 6.1% of the market. By 1981, Home's California deposits per branch were nearly double the average in the state. Grabowski asserted that a hypothetical buyer would "expect[] to be able to replicate this level of branch network growth in other markets, assuming the markets had similar levels of depositor concentration (i.e., population density)." J.A. 7139.

With respect to the growth of deposits, Grabowski estimated that it took Home five years to "ramp up" deposits in Northern California branches, and "considered this rate of individual branch ramp up to be representative of what any willing buyer would have expected." J.A. 7140. Finally, with respect to loan demand, Grabowski asserted that a hypothetical buyer would expect to be able to turn all new deposits into new loans because, historically, that had been Home's experience. Grabowski "assumed that a willing buyer would have expected the same." J.A. 7143.

The central problem with this analysis, however, is that Grabowski's assumptions were based on outdated market data and were inconsistent with the actual market conditions facing thrifts when the branching and RAP rights were actually acquired. The conditions during the acquisition period included an unprecedentedly high interest rate and pervasive disintermediation. As the Claims Court noted, "Grabowski's assumption that the hypothetical willing buyer would achieve significant deposit growth in the high interest rate environment of the early 1980s is belied by the undisputed evidence regarding the dire economic and industry-specific conditions at the time." *Claims Court Decision*, 130 Fed. Cl. at 696. Indeed, it was the unusually dire market conditions that persisted at the time that prompted the FSLIC to offer RAP and branching rights to healthy thrifts as an enticement to purchase unhealthy ones.

As the court also accurately observed, to obtain the significant deposit growth projected by Grabowski, "a hypothetical willing buyer would need to not only avoid the well-documented adverse impact of disintermediation, but also to persuade a significant number of the depositors who were still willing to deposit their funds into a savings and loan institution to deposit these funds in a new thrift." *Id.* at 697. The court found that the evidence did not support such assumptions, which the court characterized as "unreasonable" and "at odds with the economic and industry-specific realities at the time." *Id.* at 695–96. The court was entitled—and, in fact, required—to review the record "with the understanding that the tax consequences of any particular transaction must be based upon economic realities." *Kraft*, 30 Fed. Cl. at 766.

Home's experience expanding into Northern California in the 1970s, moreover, is substantially different from the inter-state expansion effectuated by its supervisory mergers in the 1980s. And, as the Claims Court found, WMI "fail[ed] to adequately account for the regulatory

hurdles that a hypothetical willing buyer would have encountered in opening *de novo* branches in projecting deposit growth." *Claims Court Decision*, 130 Fed. Cl. at 698. In particular, the court found it unlikely that a hypothetical buyer would be able to open new branches at the rate projected by Grabowski given that the timeline for regulatory approval of a new branch was typically a year or longer. *Id.* The court's findings are not clearly erroneous.

WMI argues that, even if the Claims Court's objections to Grabowski's assumptions were warranted, the court erred by disregarding the valuation *in toto*. According to WMI, the court should have modified the inputs to Grabowski's model to account for the perceived flaws in his assumptions. To support this argument, WMI points to Grabowski's "sensitivity analyses," in which he valued branching rights under the alternative assumptions that deposit growth for the first two years in a new market would be 50% less than what he projected, or that only half of the deposits would be used to fund loans for the first two years while the other half were invested in Treasury bills. WMI contends that these sensitivity analyses demonstrate the flexibility of Grabowski's approach. In particular, WMI argues that, because Grabowski's *methodology* was not flawed, the court should have just disregarded his flawed assumptions and injected new ones into the methodology. *See* Oral Arg. at 12:05–13:35 ("Q. Is it your position that . . . the court then has the obligation to readjust the assumptions and do the economic valuation? A. Yes, absolutely.").

The Claims Court, however, did not find Grabowski's sensitivity analyses helpful, questioning, among other things, why Grabowski limited his adjustments to only two years, when high interest rates were expected to endure much longer. *Id.* at 697 & n.37. Grabowski also failed to explain why he reduced deposit growth and loan demand by 50% rather than by some other percentage.

*Id.* In any event, even if these adjustments were intended to be merely demonstrative, WMI does not explain which adjustments the Claims Court purportedly should have made. *See WaMu II*, 856 F.3d at 727 ("Appellant's argument that the court was required to *sua sponte* estimate some value for the Rights is foreclosed. On these facts, such a proposition would essentially do away with the taxpayer's burden.").

Given the lack of guidance as to how the Claims Court could have modified Grabowski's model, the court's conclusion that it could not have done so, without doing so arbitrarily, is not unreasonable. *Compare Trigon Ins. Co. v. United States*, 215 F. Supp. 2d 687, 738–39 (E.D. Va. 2002) (finding that "it was of critical, outcome determinative importance that the inputs used to arrive at the valuation were accurate and reliable," and that the critical inputs "simply do not square with the facts of record" and therefore cannot be used to derive a more accurate valuation), *with Deseret Mgmt. Corp. v. United States*, 112 Fed. Cl. 438, 456 (2013) (modifying plaintiff's expert's discount rate where literature describing the appropriate modification was available in the record).

Finally, WMI argues that it was improper for the court to treat Grabowski's shortcomings with respect to the RAP rights as an independent basis for holding that WMI had not established any cost basis in the *branching rights*. According to WMI, if the court determined that Grabowski allocated too much basis to the RAP rights, the court should have found that he allocated too little basis to the branching rights. Again, we disagree.

As an initial matter, the Claims Court did not reject WMI's branching rights claims solely because it had already rejected its RAP rights claims. Rather, the court noted that, because WMI's allocation of cost basis to the RAP rights was flawed, its allocation to the branching rights must also be "call[ed] into doubt." *Claims Court*

*Decision*, 130 Fed. Cl. at 695. The court then proceeded to give reasons why WMI's cost basis allocation for the branching rights was *independently* flawed. Indeed, the court stated that, notwithstanding WMI's deficient RAP right valuation, "the evidence also shows plaintiffs have not established Home's cost basis in the Branching Rights because their fair market value determinations for this asset do not constitute a 'reasonable or rational approximation' of the value of these assets." *Id.*

More importantly, WMI's argument has merit only to the extent the branching rights and RAP rights were the *only* assets acquired in the supervisory mergers to which the cost basis must be allocated. WMI has not shown this to be the case. And, as the government points out, the failing thrifts' traditional goodwill could also absorb some of the cost basis, even if such goodwill would have been of low value during the savings-and-loan crisis. *See Deseret Mgmt.*, 112 Fed. Cl. at 450–51 (noting that even unprofitable companies possess goodwill).

Grabowski's methodology is only as good as his assumptions, which, as the Claims Court found, were inconsistent with market realities and, at times, unsupported. Because the court's findings are not clearly erroneous, we affirm the court's ruling.[6]

### III. Bowery Transaction

Finally, as discussed above, Bowery obtained assistance from the FDIC in 1988 to replace the assistance it

---

[6] The government also argued before the Claims Court that Home did not, in fact, abandon its branching rights, and that WMI therefore could not claim deductions for those rights. We need not reach that argument because, even assuming that Home abandoned the rights, we conclude that WMI failed to establish a cost basis in each of those rights.

had been receiving pursuant to a 1985 merger. WMI argues that it should have received amortization deductions for the 1985 rights, which did not materially change in 1988. The Claims Court disagreed, finding that the deductions should be based on the "new" assets that Home acquired in the 1988 Bowery acquisition. *Claims Court Decision*, 130 Fed. Cl. at 701–02. "We review the characterization of transactions for tax purposes de novo, based on underlying findings of fact, which we review for clear error." *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011).

We agree with the Claims Court that the 1988 exchange of rights constituted a realization event that triggered Home's tax obligations. Section 1001(a) of the Internal Revenue Code provides that "[t]he gain [or loss] from the sale or other disposition of property" is the difference between "the amount realized" from the disposition of the property and its "adjusted basis." I.R.C. § 1001(a). A disposition of property for this purpose includes "the exchange of property for other property differing materially either in kind or in extent." Treas. Reg. § 1.1001-1(a). In other words, an exchange of property "gives rise to a realization event so long as the exchanged properties are 'materially different'—that is, so long as they embody legally distinct entitlements." *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 566 (1991).

Here, the Claims Court correctly determined that the government assistance provided to Bowery in 1988 was materially different from that provided in 1985. As the court noted, the 1988 assistance, among other things, eliminated an income maintenance agreement—which was intended to reduce Bowery's interest rate risk for a defined asset base for up to fifteen years—and decreased the amount of assets covered by credit protection. *Claims Court Decision*, 130 Fed. Cl. at 670, 701. Additionally, the 1988 assistance eliminated the 1985 RAP right, which allowed Bowery to reverse its purchase accounting ad-

justments for the purpose of calculating capital for regulatory purposes. It replaced that right with a new one that allowed Bowery to count goodwill arising out of the Bowery acquisition toward regulatory capital. *Id.* Finally, the 1988 right increased the amortization period from fourteen years to twenty years. *Id.*

As the Claims Court noted, these differences demonstrate that the assistance packages "embody legally distinct entitlements and that a realization event occurred when the Bowery entered into the 1988 Bowery Assistance Agreement." *Id.* at 702 (quoting *Cottage Sav.*, 499 U.S. at 566). The 1988 RAP right did not merely change the mechanics of the 1985 RAP right, as WMI contends; it provided a new methodology by which goodwill is defined. Indeed, as WMI concedes, the two RAP rights could lead to different legal consequences based on the same facts. *See* Reply 26–27. These different legal consequences imply different legal entitlements. *See Cottage Sav.*, 499 U.S. at 566 (holding that a transaction in which a company exchanged its interests in one group of residential mortgage loans for another lender's interests in a different group of loans was a realizable transaction); *Phila. Park Amusement Co. v. United States*, 130 Ct. Cl. 166, 168–70 (1954) (holding that an amendment of a taxpayer's railway franchise to extend the term by ten years and transfer away ownership of a bridge constituted an exchange for tax purposes). The Claims Court therefore correctly determined that the 1988 exchange gave rise to a realization event.

WMI asserts that, even if, in certain respects, the 1988 RAP right is different from the 1985 RAP right, the exchange nevertheless qualifies as a "like-kind exchange," which would allow Bowery to defer recognition of a gain or loss. *See Deseret Mgmt.*, 112 Fed. Cl. at 447 ("Such an exchange allows the exchanger to delay recognizing gain on the exchanged property, as the tax basis of that property carries forward to the newly-acquired property.").

But this, too, is incorrect and was properly rejected by the Claims Court.

Section 1031(a) of the Code operates as an exception to § 1001(a), allowing a taxpayer to defer recognition of gain or loss from qualifying exchanges of "like kind" property. I.R.C. § 1031(a)(1). The phrase "like kind" refers "to the nature or character of the property." Treas. Reg. § 1.1031(a)-1(b). The exception applies when "the taxpayer's economic situation after the exchange is fundamentally the same." *VIP's Indus. Inc. v. Comm'r*, 105 T.C.M. (CCH) 1890, 2013 WL 3184624, at *3 (T.C. 2013); *see Snowa v. Comm'r*, 123 F.3d 190, 193 n.5 (4th Cir. 1997). That is not the case here. As the Claims Court pointed out—and as described above—the nature and character of Bowery's RAP right fundamentally changed because, among other things, it allowed Bowery to account for the goodwill arising out of Home's acquisition as an asset as opposed to reversing the write-down on Bowery's loans. *Claims Court Decision*, 130 Fed. Cl. at 703.

We agree with the Claims Court that Bowery's 1988 receipt of an assistance package was a realization event, and we therefore affirm the court's ruling.

CONCLUSION

While we recognize that WMI may have been entitled to some deduction, our holding inevitably flows from the fact that the burden to value the basis for the assets at issue was squarely upon WMI, which failed to satisfy that burden. For these reasons, we affirm the Claims Court's dismissal of WMI's tax refund claims.

**AFFIRMED**

COSTS

No costs.